**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Tina Guetschow | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 CV 50260 |
| | ) | Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Tina Guetschow brings this action under 42 U.S.C. §405(g), challenging the

denial of social security disability benefits. The appeal raises one issue, which can be stated as

follows:  whether the administrative law judge ("ALJ") properly rejected the opinions of two

treating physicians and relied instead on the ALJ's own layperson analysis to find that plaintiff's

problems from multiple sclerosis and spinal degeneration had improved to the point where she

could work full time. The answer to this question, not surprisingly, leads to this outcome:  the

case is remanded.

**BACKGROUND**

Plaintiff filed for disability benefits in August 2012, soon after being diagnosed with

multiple sclerosis. She was then 41 years old. Her medical care was coordinated through Dr.

Jack-ky Wang at the Beloit Clinic. Plaintiff first visited the clinic in May 2012, complaining

about a diffuse list of problems. After various tests and measurements (including an MRI and a

test of her CSF fluid), doctors at the Beloit Clinic tentatively diagnosed her with multiple

sclerosis and then referred her to Dr. Christopher Luzzio at the University of Wisconsin for a

second opinion. After reviewing plaintiff's medical records and examining her, Dr. Luzzio confirmed that she had multiple sclerosis—specifically "relapsing-remitting" multiple sclerosis. Over the next two years or so, plaintiff was seen multiple times by both Dr. Wang and Dr. Luzzio and was also referred to other doctors to address specific issues, such as vision problems.

Both Dr. Wang and Dr. Luzzio completed two-page checkbox-style questionnaires about plaintiff's limitations. Dr. Luzzio completed a form on July 5, 2013. *See* Ex. 10F. He opined that plaintiff's medical problems would allow her to stand (with breaks) three hours a day on a job, sit (with breaks) for three hours, and walk for one hour. In response to a question about expectations for the future, he checked the box "Unknown" (the other possible answers were "Improvement, "No Change," or "Deterioration") and then wrote the following: "Chronic unpredictable disease – can have ups and downs." In response to a question asking about plaintiff's treatment, he wrote the following: "Meds: Neurontin, Avonex injections weekly, Zoloft. Neuropsych testing being scheduled, routine visits, has had MRI, L.P." In response to the last question, asking for additional comments, he wrote the following: "[Patient] also has dysthymia. Her extreme fatigue, balance, weakness of lower extremities are all contributing to her disability related to this disease."

Dr. Wang completed a similar two-page form about a year later, on July 1, 2014. *See* Ex. 9F. He wrote that plaintiff had suffered from fatigue, unsteady gait, and blurry vision, the latter condition was labelled "now resolved." He opined that she could sit for about four hours a day on a job, could stand and walk for about an hour, and would need unscheduled breaks every 30 minutes. He stated that, in a normal work day, plaintiff could use her right hand 20% of the day, her right fingers 20% of the day, and her right arm could be raised overhead 50% of the day. He

estimated that she would be off task more than 30% of the day and would miss approximately five days a month.

On July 30, 2014, a hearing was held before the ALJ. Plaintiff testified that she received a weekly injection for her multiple sclerosis, which usually led to headaches and flu-like symptoms requiring her to lie around the next day. She had been taking the injections for a year and half, but was still experiencing problems despite them. Her multiple sclerosis caused vision problems; "a lot of pain," particularly in her hip, back, right arm, right foot, and neck; sleep problems; fatigue; headaches (both "shooting pains" and "normal" lighter headaches); and urinary problems. She also had a lump on her thumb that would swell up and hurt badly when used too much. She was married and lived with her husband and 11-year old son. A vocational expert testified after plaintiff. No medical expert testified.

On August 19, 2014, the ALJ found plaintiff not disabled in a 7-page decision (about half of which was boilerplate found in all ALJ decisions). The ALJ found that plaintiff had as severe impairments of multiple sclerosis and degenerative disc disease  but that she was able to do sedentary work subject to certain limitations.

## DISCUSSION

As noted, the sole issue is whether the ALJ was justified in rejecting Dr. Wang's and Dr. Luzzio's opinions. This issue requires consideration of the treating physician rule. Under this rule, a treating physician's opinion is entitled to controlling weight if it is supported by medical findings and consistent with other substantial evidence in the record. 20 C.F.R. §404.1527(c)(2); *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014). If the ALJ does not give the treating physician's opinion controlling weight, the ALJ cannot simply disregard it without further analysis. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Instead, the ALJ must determine

what specific weight, if any, the opinion should be given. *Moss v. Astrue*¸ 555 F.3d 556, 561 (7th Cir. 2009). To make this determination, the ALJ must apply the checklist of six factors set forth in 20 C.F.R. §404.1527(c)(2). *Campbell*, 627 F.3d at 308 (referring to the factors as a "required checklist"). Failure to apply the checklist is reversible error. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (ALJ disregarded checklist).

Here, the ALJ did not follow this two-step process. The ALJ did not refer to the treating physician rule, did not apply the requirements in the first step, and did not apply the checklist factors in the second step. Specifically, under the first step, the ALJ did not analyze whether these opinions were "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or consistent with "other substantial evidence." 20 C.F.R. §404.1527(c)(2). As plaintiff summarized in her opening brief, these two doctors reached their conclusions only after multiple tests, such as brain MRIs, had been performed. Neither the ALJ, nor the Government, has suggested that any important test or measurement was not performed. As for whether the doctors' opinions were consistent with other evidence, this question also was not analyzed in a consistent way. The ALJ made a general assertion that Dr. Wang's opinion was "not supported by the medical evidence of record," but this statement was not followed by any explanation or citation to specific evidence. And, of course, Dr. Wang's opinion was supported by medical evidence in the record; specifically, it was supported by Dr. Luzzio, plaintiff's other treating physician. Significantly, there were no medical opinions in the record from other doctors or consultants contradicting or casting doubt on these two opinions. The ALJ chose not to call an expert at the hearing, and gave no weight to the opinions of the agency doctors.

As for Step Two, the ALJ did not analyze the six checklist factors. As for the first two— length and nature of treatment—the ALJ made no determination about the specific number of

visits nor the precise length of the treating relationship. The ALJ gave no weight to the fact that these doctors saw plaintiff multiple times over several years. To the contrary, as discussed below, the ALJ inexplicably concluded that Dr. Wang's opinion deserved little weight because he did not see plaintiff enough. However, plaintiff's treating doctors had a close and collaborative relationship. As plaintiff summarized, Dr. Wang coordinated plaintiff's referrals to multiple specialists in the Beloit Clinic network, including rheumatology visits, an orthopedic evaluation, an ophthalmology exam, and a GI evaluation. Dkt. #24 at 2. Dr. Wang and Dr. Luzzio also kept each other informed about plaintiff's condition and test results. In short, the first two checklist factors support these doctors' opinions. The ALJ also completely ignored the fifth factor, which asks about the doctor's degree of specialization. This factor weighs in favor of these doctors' opinions, particularly that of Dr. Luzzio. He was a neurologist who worked at a University clinic specializing in the treatment of multiple sclerosis. The ALJ did not acknowledge this important fact nor give it any weight.

The only argument offered by the Government in response is that one of the ALJ's specific criticisms of Dr. Luzzio's opinion, which is discussed below, invokes the fourth factor concerning the consistency of the opinion. Dkt. #23 at 6. But the Government does not address the other factors, especially the ones discussed above. In sum, if the ALJ had explicitly applied these checklist factors, it is possible that she would have reached a different result, but more importantly, she at least would have been forced to provide a greater explanation.

It is true that the ALJ did not completely ignore the two opinions, and discussed each in a paragraph. However, despite this fact, the Court takes the view that an explicit analysis is still required. *See Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, *8-9 (N.D. Ill. Aug. 4, 2015). But

even if the Court allowed an implicit analysis, it would still remand because too many questions are unresolved.

The Court first considers the ALJ's analysis of Dr. Wang's July 2014 opinion, which was given "little weight." The ALJ gave two reasons for the conclusion. The first is that the opinion supposedly "contrasts with his earlier December 2012 opinion that [plaintiff] 'may need to be on temporary disability until meds are straightened out and [she is] having no issues with them.'" R. 15. To clarify, the earlier referenced opinion is not a formal opinion nor is it even clear it was made by Dr. Wang himself. The statement is in Dr. Wang's December 21, 2012 office notes, but he appears to be summarizing what someone in Dr. Luzzio's office (perhaps Dr. Luzzio but possibly a staff person) told him. Set forth below is the entirety of this "opinion":

> PER UW NEUROLOGY/MS CLINIC. CALL IF WORSE. PT MAY NEED TO BE ON TEMPORARY DISABILITY UNTIL MEDS ARE STRAIGHTENED OUT AND HAVING NO ISSUES WITH THEM.

R. 326. Although not articulated by the ALJ, the underlying rationale seems to be that this opinion—that plaintiff's condition was only temporary—should be given more weight than the later opinion. But this inference is dubious at best. This brief statement is vague and ambiguous. There is no analysis or explanation. The statement was made in 2012, 18 months before Dr. Wang's more formal opinion. The ALJ seems to think that the two opinions are incompatible, but they can be reconciled fairly easily simply by viewing the first as provisional judgment later modified after additional testing and observation—a process generally used in diagnosing and evaluating impairments. To the extent that a choice must be made, these facts suggest that the latter opinion deserves more weight. It is longer and based on more data, including more time elapsed, more doctor visits, and more tests.

This leads to the ALJ's second reason, which in some ways undermines the first. The ALJ noted that plaintiff saw Dr. Wang "once or twice a year, starting in May 2012."[1] The ALJ's statement is more an observation than a fleshed-out argument. The premise seems to be that six visits over a two-year period was not enough to allow Dr. Wang to offer a credible opinion. But this argument runs contrary to many Social Security cases, where ALJs routinely rely on medical opinions rendered after a single or even no visit. Indeed, ALJs routinely rely on the opinions of consulting experts who never treat a claimant, but instead simply review medical records. Here, it does not appear that there is any doctor who saw plaintiff more than Dr. Wang or Dr. Luzzio saw her. Dr. Wang did not rely merely on a "snapshot" but saw plaintiff multiple times. Moreover, as summarized above, Dr. Wang coordinated plaintiff's care and reviewed reports from multiple doctors, giving him an even wider picture of plaintiff's condition. In sum, the ALJ's two reasons provide a woefully insufficient basis for rejecting Dr. Wang's opinion.

Similar concerns exist about the ALJ's analysis of Dr. Luzzio's opinion, which was given "limited weight" based on three reasons. Two are inconsequential and can be addressed quickly. The first reason is the ALJ's observation that Dr. Luzzio's opinion was "posited before [plaintiff] started physical therapy." R. 15. The Court is not even certain the ALJ meant this to be an argument because it reads more like a passing observation. But even if it were an argument, which the Government seems to believe, the ALJ offered no explanation for why the initiation of physical therapy likely would alter the bottom-line diagnosis, nor is there any attempt to investigate whether physical therapy was undertaken and then led to improvement. This argument is simply undeveloped and meritless.

[1] The ALJ's statement about the number of visits—"once or twice a year"—is taken from Dr. Wang's opinion. However, as set forth in plaintiff's reply brief, she saw Dr. Wang for a total of six visits from May 2012 through May 2014. Dkt. #24 at 1-2. This indicates that the frequency was slightly higher—approximately three times a year.

Another less-than-convincing reason is the ALJ's general assertion that Dr. Luzzio's opinions were beyond his "expertise and authority" because he made the final determinations reserved to the Commissioner. R. 15 (citing to SSR 96-5p). But the ALJ's point that a doctor cannot make the final determination of disability does not mean that these two doctors' underlying conclusions should also be ignored. *See Bates v. Colvin*, 736 F.3d 1093, 1100 n.4 (7th Cir. 2013) ("although the ALJ need not defer to a doctor's opinion about a claimant's ability to work, it still cannot ignore the doctor's opinion when determining a claimant's RFC").

The ALJ's third reason is more substantive and loosely points to the larger theory that percolates throughout the opinion but that ultimately is never fully explained nor supported by an expert opinion. This reason is set forth in the following sentence: "In the last two appointments, [plaintiff's] functional score was zero or 1, reflecting minimal MS-related disability." R. 15. Based on the citations provided by the ALJ, these two visits took place on October 7, 2013 and April 18, 2014. *See* 12F at 9-11. In this sentence, the ALJ seems to be suggesting that plaintiff's condition had improved, perhaps after an initial trial period adjusting medications. But the ALJ failed to develop this theory in any consistent way, and did not provide background or analysis. For one thing, the ALJ did not state what the "functional score" being referred to was, but the Government attempted to fill in this gap by explaining in a footnote that this score refers to the Expanded Disability Status Scale ("EDDS") which "measures the disability status of people with MS."[2] Dkt. #23 at 4 n.1. The ALJ also provided no information about what this score specifically measures and whether it is considered by experts in the field as the definitive test or whether it is merely one of several measures used to make an assessment. The Court notes that the Government's description of the test refers several times to "ambulatory ability," raising a

---

[2] The Government's explanation comes from a website.

question whether this test is focused on this one ability. This is one of several reasons why an expert witness must be called on remand. HALLEX I-2-34A.2.

Related to the latter point, the notes from the two doctor visits cited by the ALJ do not provide evidence that Dr. Luzzio had changed his opinion about plaintiff's condition or her long-term prospects. It is true that Dr. Luzzio noted that plaintiff had low EDDS scores on these two occasions, but he also noted that plaintiff continued to suffer from problems such as headaches, and he changed her pain medications each time to treat ongoing problems.[3] The ALJ left out this contrary evidence, resulting in a classic example of cherry-picking.

The larger concern is that ALJ's analysis throughout the opinion was not based on any expert medical opinion and that the ALJ, therefore, was playing doctor. *See Engstrand v. Colvin,* 788 F.3d 655, 660-61 (7th Cir. 2015); *Lewis v. Colvin*, No. 14 CV 50195, 2016 U.S. Dist. LEXIS 115969, *11 n. 3 (N.D. Ill. Aug. 30, 2016) (courts, counsel, and ALJs must resist the temptation to play doctor). The ALJ's general approach was to pick out various observations from the record (mostly from Dr. Luzzio's and Dr. Wang's own notes) and then construct an alternate layperson diagnosis. This was improper second-guessing. It is possible on remand, with the help of an expert witness and with a more complete analysis and explanation, that the ALJ's intuitions will be proven correct. One important question is whether, as the ALJ seems to believe, plaintiff had reached a permanent state of improvement or whether, as plaintiff maintains, she was merely experiencing in these two office visits the normal periods of remission one would expect with a diagnosis of relapsing-remitting multiple sclerosis. Although the ALJ periodically referred to the "intermittent" nature of plaintiff's condition, she did not give this point serious consideration

---

[3] *See* R. 542 ("I have asked her to increase her Neurontin or gabapentin to 600 mg 3 times daily."); R. 543 (noting that, although plaintiff was "doing very well with respect to" her EDDS score, she was still having problems with dysthymia, high blood pressure, and headaches; prescribing a new medication (topiramate) and discontinuing another (gabapentin); observing that plaintiff's "MRI scans in the past are consistent with multiple sclerosis as well as a lumbar puncture"; and observing that "[h]er diagnosis is still fairly recent within the last few years").

when she placed great weight on these two visits. All of these medical questions about the type, nature, and likely progression of multiple sclerosis are why the ALJ (and ultimately this Court) would have benefitted from the calling of an expert witness.[4] *See* HALLEX I-2-5-34A.2.

For the above reasons, this case is remanded. On remand, the ALJ must call a medical expert or otherwise develop the record to address these questions. *See* HALLEX I-2-5-34A.1. The ALJ should also re-contact Dr. Wang and Dr. Luzzio to clarify and update their opinions. *See* SSR 96-5p.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date:  January 23, 2017                              By:  _____

Iain D. Johnston
United States Magistrate Judge

---

[4] There are a several other points where the ALJ appeared to play doctor or failed to provide a clear explanation. For example, the ALJ asserted that plaintiff's psychological problems were "caused by the MS, not depression or anxiety." R. 13. This statement is not supported by any medical opinion and is ambiguous in any event. The credibility analysis is also confusing. The ALJ first stated that plaintiff's allegations were "credible and consistent with the medical evidence." R. 15. If true, this would reinforce the doctor's opinions. But in the next paragraph, the ALJ inserted the boilerplate paragraph that plaintiff's allegations about the "intensity, persistence and limiting effects" of her symptoms were "not entirely credible," which is not followed by an explanation and which seems to be a sudden turn-around from the previous paragraph.